**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

—————————————————————————

**NICHOLAS C.,**

**Plaintiff,**

**v.**                                                         **3:18-CV-1234**
                                                                     **(TJM)**

**COMMISSIONER OF SOCIAL SECURITY,**

**Defendant.**

—————————————————————————

**THOMAS J. McAVOY,**
**Sr. U. S. District Judge**

### DECISION & ORDER

Plaintiff Nicholas C. brings this action pursuant to the Social Security Act, 42 U.S.C.

§ 405(g), for review of a final determination by the Commissioner of Social Security

denying her application for benefits. Plaintiff alleges that the Administrative Law Judge's

decision denying his application for benefits was not supported by substantial evidence

and was contrary to the applicable legal standards. Pursuant to Northern District of New

York General Order No. 8, the Court proceeds as if both parties had accompanied their

briefs with a motion for judgment on the pleadings.

## I.     PROCEDURAL HISTORY

Plaintiff applied for Title II Social Security benefits on January 29, 2015. See Social

Security Administrative Record ("R"), dkt. # 8, at 211. The Social Security Administration

denied Plaintiff's application on March 19, 2015. Id. at 91. Plaintiff appealed, and

Administrative Law Judge Gretchen Mary Greisler held a hearing on June 6, 2017. The

ALJ issued an unfavorable decision on July 19, 2017. See R. 11-28. Plaintiff appealed,

and the Social Security Appeals council denied his request for review on August 22, 2018.

Id. at 1. Plaintiff then made a timely application to US District Court.  This Court has

jurisdiction over the ALJ's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.    FACTS

The Court will assume familiarity with the facts and set forth only those facts

relevant to the Court's decision.

Plaintiff, who injured himself at work and received workers' compensation in 2011,

alleges Social Security disability due to: cervical myalgia; degenerative disc disease;

occipital headache, and depression.  R. at 78.

## III.    THE ADMINISTRATIVE LAW JUDGE'S DECISION

The question before the ALJ was wether Plaintiff was disabled under the Social

Security Act.  The ALJ engaged in the five-step analysis required by 20 C.F.R. §

416.920(a) to determine whether a claimant qualifies for disability benefits.  See R.  at 14-

28.

> The Social Security Administration regulations outline the five-step,
> sequential evaluation process used to determine whether a claimant is
> disabled: (1) whether the claimant is currently engaged in substantial gainful
> activity; (2) whether the claimant has a severe impairment or combination of
> impairments; (3) whether the impairment meets or equals the severity of the
> specified impairments in the Listing of Impairments; (4) based on a "residual
> functional capacity" assessment, whether the claimant can perform any of his
> or her past relevant work despite the impairment; and (5) whether there are
> significant numbers of jobs in the national economy that the claimant can
> perform given the claimant's residual functional capacity, age, education, and
> work experience.

McIntyre v. Colvin, 758 F.3d 146, 150 (2d Cir. 2014).

The ALJ applied these five steps.  Noting that Plaintiff last met the insured status

requirements of the Act on December 31, 2016, the ALJ found at Step 1 that Plaintiff did not engage in substantial gainful activity from the alleged onset date of April 20, 2011 until his last insured day on December 31, 2016.  Id. at 16.  At Step 2, the ALJ found that Plaintiff suffered from the severe impairments of cervical spine degenerative disc disease, obesity, brachial neuritis and ligamentous tear in the left knee.  Id.  These impairments, the ALJ found, "more than slightly limit the ability to perform basic work activities[.]"  Id. at 17.  The ALJ also found that Plaintiff suffered from the non-severe impairments of hypertension, asthma, and migraine headaches.  Id. at 17-18.  The ALJ rejected Plainitff's additional claims that he suffered from low-back and mental-health impairments as well.  Id. at 18-19.  At Step 3, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically exceeded the severity of a listed impairment in 20 C.F.R. 4040.1520(d), 404.1525 and 404.1526.  Id. at 20.

At step four, the ALJ held that Plaintiff had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), and that Plaintiff could lift/carry up to ten pounds, could sit for an hour before needing a break of three minutes or less to strech.  Id. at 20.  He retained the ability to remain on task, could occasionally bend and climb stairs and ramps.  Id.  He could never climb ladders, ropes or scaffolds, but could occasionally reach in all directions.  Id.

The ALJ also found that the Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, his statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record.  Id. at 21.  As such, the ALJ considered those statements "only to the extent that they can reasonably

3

be accepted as consistent with the objective medical record." Id.

The ALJ concluded that the medical record "reflect[ed] no more than mild diagnostic findings of a preexisting degenerative disc disease and no evidence of nerve root injury and/or neurologic impairment[.]" Id. at 21.  The ALJ also considered the medical record as it related to Plaintiff's cervical spine. Id. at 21-22.  Such records indicated "multilevel degenerative disc disease, with stenosis C3 through C6-7." Id. at 21.  A 2011 MRI also showed "minimal evidence of chronic spinal chord compressions C3-4 and no myelopathy identified." Id. at 21.  Those records also showed that physical therapy did little to improve Plaintiff's condition, but that narcotics had alleviated the pain. Id. at 21.  Placement of bilateral posterior cervical and occipital electrodes in a spinal cord stimulator trial proved somewhat successful, as the ALJ noted: "[t]he claimant . . . admitted that the stimulator helped control his pain but that he was more concerned that if his pain was controlled with the stimulator, he would lose his benefits." Id. at 22.  A later MRI, in December 2016, "showed degeneration with desiccation, loss of height, modic-endplate changes and posterior disc/osteophytes resulting in moderate to severe stenosis, C3-C7." Id. at 23. Such findings, the ALJ concluded, "do not support a conclusion that" Plaintiff "would be unable to work at a level consistent with the established residual functional capacity." Id.

The Plaintiff had received workers' compensation benefits after his initial neck injury. While the ALJ noted that Workers' Compensation requirements and those for obtaining Social Security disability benefits are different, the ALJ also pointed to decisions by the Workers' Compensation Board to support her conclusions about Plaintiff's capacity. Id. at 22.  In a decision issued on August 28, 2014, the Board determined that, despite a soft tissue cervical injury, Plaintiff could do light work. Id.  The ALJ found this conclusion

4

"consistent with the tenor of evidence made part of the record." Id. Records indicated that Plaintiff engaged "in a wide range of activities of daily living[.]" Id. He cleaned his home once a week, showered every day, watched television, listened to music, and read. Id. While he claimed difficulty walking, Plaintiff could manage money and drive short distances. Id. He was unsure whether he could "sit long enough for public transportation." Id. "No objective findings," moreover, demonstrated any limitations on sitting during an eight-hour workday. Id. Nor did Plaintiff show any limitations to his ability in "handling, fingering, feeling, and reaching," since he stated that he enjoys "working as a gunsmith, playing guitar, and tinkering with mechanical items." Id. Various tests showed only brief or mild restrictions on activity. Id.

The ALJ also pointed to a Physical Work Performance Evaluation from August 2015. Id. That testing revealed "tolerance limitations to activities tested," but also showed that Plaintiff's "pain or pain behaviors were considered inconsistent with the observed deviations on tasks with regard to sitting, standing, [and] overhead arm range of motion both standing and supine[,] and walking." Id. The consultant who did the testing also concluded that Plaintiff had engaged in "self-limiting and inconsistent behavior" in the testing. Id. at 23. The "sedentary level of exertion" established by the testing was Plaintiff's "'minimum ability' rather than a maximum." Id.

A consultative examination, the ALJ found, supported her assessment of Plaintiff's RFC. The March 2015 examination by Gilbert Jenoui, MD, found a "relatively mildly restricted cervical range of motion," and that Plaintiff "was in no acute distress and needed no assistance with changing for the examination or getting in/out of the chair." Id. Dr. Joenoui found "'mild' limitations in walking, standing, sitting long periods, bending, climbing

5

stairs, lifting and carrying[.]" Id. Plaintiff had normal grip strength. Id. Plaintiff's gait showed "antalgia on the right," but "no objective clinical findings or treatment of a condition that would limit" Plaintiff's "lumbar spine flexion and/or extension" existed "during the period in issue." Id. Other examinations and medical evidence supported the ALJ's assessment that Plaintiff's lumbar spine, obesity, brachial neuritis, and knee issues did not provide substantial limitations in the relevant period. Id. at 23-24.

In evaluating the opinion evidence, the ALJ gave "great weight" to an opinion by State Agency review physician T. Harding, PhD, which Dr. Harding issued in March 2015. Id. at 24. Dr. Harding found that Plaintiff did not suffer from a severe impairment in mental health. Id. The ALJ gave little weight to Dr. Slowik, who served as a mental health consultative examiner. Id. Dr. Slowik, the ALJ pointed out, had examined Plaintiff once. Id. "The clinical findings," however, "did not support more than mildly impaired concentration and did not support a severe schedule or complex tasks." Id. Slowik "noted" that Plaintiff's "condition was caused by a lack of motivation." Id.

The ALJ also gave "little weight" to the findings of "David Storrs, MD, family practitioner Mark Corey, M.D., and Sajid Khan, M.D." Id. Dr. Storrs had opined on what Plaintiff might be able do in June 2011, but that opinion came "two months after the" Plaintiff's "initial injury and was no more than speculative at that time." Id. The ALJ also "reviewed" progress notes from Mohammed Jalaluddin, M.D., but found his "opinions with regard to the claimant having a percentage of disability" to have "little evidentiary value because the conclusions are in terms of 'temporary' 'temporary partial' or a percentage of 'temporary.'" Id. None of these providers, the ALJ found, offered "specific limitations of function with regard to the claimant's ability to sustain work activity." Id.

The ALJ assigned "partial evidentiary weight" to Dr. Jenouri's opinions as consultative examiner. Id. at 26. She assigned that weight "to the extent the limitations, vaguely identified, are consistent with the record showing an individual attending school, playing guitar and performing duties as a gunsmith." Id. At the same time, the ALJ concluded, "[t]he findings of Dr. Jenouri [are] an overestimate of the severity of the claimant's restrictions and limitations and based only on a one-time assessment of the claimant's functioning." Id. The ALJ also found limited evidentiary value in the Work Capacity Evaluation, both because such worker's compensation analyses ask different questions than disability determinations, and because Plaintiff engaged in "self-limiting" behavior during the assessment. Id. at 26.

Applying the assigned RFC, the ALJ determined that Plaintiff could not perform his past relevant work as an HVAC technician. Id. At 54 years old, Plaintiff was "an individual closely approaching advanced age" when he was last insured. Id.

Finally, the ALJ addressed the step-five determination of Plaintiff's ability to work considering his residual functional capacity, age, education, and work experience. Id. at 26-27. The ALJ used the testimony of a vocational expert to determine whether jobs existed in the national economy for a person with Plaintiff's limitations. Id. at 27. The vocational expert pointed to unskilled jobs with "light . . . exertional demands" like greeter, lobby attendant, and school bus monitor. Id. Because such jobs existed, the ALJ determined that Plaintiff "was capable fo making a successful adjustment to other work that existed in significant numbers in the national economy." Id. The ALJ thus concluded that Plaintiff was not disabled within the meaning of the Act. Id.

## IV. STANDARD OF REVIEW

The Court's review of the Commissioner's determination is limited to two inquiries. See 42 U.S.C. § 405(g). First, the Court determines whether the Commissioner applied the correct legal standard. See Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990); Shane v. Chater, No. 96-CV-66, 1997 WL 426203, at *4 (N.D.N.Y July 16, 1997)(Pooler, J.)(citing Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)). Second, the Court must determine whether the Commissioner's findings are supported by substantial evidence in the administrative record. See Tejada, 167 F.3d at 773; Balsamo, 142 F.3d at 79; Cruz, 912 F.2d at 11; Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982). A Commissioner's finding will be deemed conclusive if supported by substantial evidence. See 42 U.S.C. § 405(g); see also Perez, 77 F.3d at 46; Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984)("It is not the function of a reviewing court to determine *de novo* whether a Plaintiff is disabled. The [Commissioner's] findings of fact, if supported by substantial evidence, are binding.")(citations omitted).

In the context of Social Security cases, substantial evidence consists of "more than a mere scintilla" and is measured by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.2d 842 (1971)(quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)). Where the record supports disparate findings and provides adequate support for both the Plaintiff's and the Commissioner's positions, a reviewing court must accept the ALJ's factual determinations. See Quinones v. Chater, 117 F.3d 29, 36 (2d Cir. 1997)(citing Schauer v. Schweiker, 675

F.2d 55, 57 (2d Cir. 1982)); Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990). Although the reviewing court must give deference to the Commissioner's decision, a reviewing court must bear in mind that the Act is ultimately "'a remedial statute which must be 'liberally applied;' its intent is inclusion rather than exclusion.'" Vargas v. Sullivan, 898 F.2d 293, 296 (2d Cir. 1990)(quoting Rivera v. Schweiker, 717 F.2d 719, 723 (2d Cir. 1983)).

## V.    ANALYSIS

Plaintiff alleges two sets of errors in the ALJ's opinion. For the reasons stated below, the Court will address in detail only the Plaintiff's argument related to the weight given the opinion evidence.

### A.    Weight given to the Medical Opinions

Plaintiff contends that the ALJ failed to address the opinion of Dr. Mohammed Ibrahim properly. Plaintiff argues that Dr. Ibrahim was his treating phsyician, and the ALJ failed to address Dr. Ibrahim's conclusion that Plaintiff could not work more than twenty hours per week and would miss more than three days a month due to his condition. If the ALJ had adopted these conclusions, Plaintiff argues, her decision on disability would have been different. The government responds that the ALJ properly rejected Dr. Ibrahim's opinion. That opinion, the government contends, is inconsistent and some of Dr. Ibrahim's conclusions illogical. Moreover, the record does not make clear whether Ibrahim was even Plaintiff's treating physician. In the end, the government insists, the ALJ provided good reasons for rejecting Dr. Ibrahim's opinion. Dr. Ibrahim lacked proper support for his position and uses inaccurate information.

Normally, an ALJ is required to find a treating physician's opinion controlling when

9

the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." 20 C.F.R. 404.1527(c)(2). "On the other hand, in situations where 'the treating physician issued opinions that [were] not consistent with other substantial evidence in the record, such as the opinion of other medical experts,' the treating physician's opinion 'is not afforded controlling weight.'" Pena ex rel. E.R. v. Astrue, 2013 WL 1210932, at *15 (E.D.N.Y. March 25, 2013) (quoting Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004)); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir.1999) ("When other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given."). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." Snell, 177 F.3d at 133. "'[T]o override the opinion of the treating physician, we have held that the ALJ must consider, *inter alia*: (1) the frequen[c]y, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the physician is a specialist.'" Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015) (quoting Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013)). An ALJ must "set forth her reasons for the weight she assigns to the treating physician's opinion." Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000).

At issue in this case is the Physical Residual Functional Capacity Assessment provided by Dr. Ibrahim, a general family practitioner in Owego, New York. See R. at 854-856. Dr. Ibrahim reports that he first began treating Plaintiff in April 2011. Id. at 854. Dr. Ibrahim diagnosed Plaintiff with chronic neck pain, cervical disc disease, left knee medial

10

meniscal tear, lumbar disc disease, and chronic headaches. Id. He pointed to a number

of clinical findings and test results that confirmed Plaintiff's impairments, including an MRI

of the cervical spine in 2012 that "confirm[e]d" Plaintiff's degenerative disc disease of the

cervical spine, an earlier MRI that confirmed Plaintiff's left knee issues, and "marked neck

pain and reduced [range of motion]" in a "physical exam." Id. Dr. Ibrahim identified

Plaintiff's "principal symptoms" as "headaches, posterior neck pain, lower back pain, [and]

[right] knee pain." Id. He described Plaintiff's posterior neck pain as "constant" and

"moderate" and Plaintiff's headaches in the occipital region as "constant" and "moderate."

Id. The pain, Dr. Ibrahim reported, was often severe enough "to interfere with attention and

concentration." Id. Plaintiff's progrnosis was "guarded." Id. at 855.

Dr. Ibrahim reported no limitations on Plaintiff's use of his hands or feet. Id. He

pointed to an attached Functional Capacity Evaluation ("FCE") report to provide medical

support for his findings. Id. Dr. Ibrahim again pointed to the FCE report when he

discussed the amount of time Plaintiff could perform particular functions during a day. Id.

at 856. He concluded that Plaintiff could sit for four hours in the workday, could not stand

at all, and could walk for six hours. Id.[1] Again citing the FCE report Dr. Ibrahim concluded

---

[1]This section of the report appears contradictory. The report asks "how many hours
an individual" could perform certain tasks in a workday. R. at 856. The section is divided
into two columns. Id. The first asks for the total time a person could perform a job during
a workday. Id. The second asks how many hours the person could perform that task
without interruption. Id. Here, Dr. Ibrahim's opinion finds that Plaintiff could perform a
task in total for fewer hours than he opined Plaintiff could perform the task at one time. Id.
This may have to do with the wording of the report. Id. The section that asks how long a
person could perform a task without interruption asks for scores along a range laid out as:
"0 15min. 30min. 1 2 3 4 5 6 7 8." Id. For sitting, Dr. Ibrahim circled 4 for the total number
of hours in an 8-hour workday, but then circled 8 as the amount of time Plaintiff could work
without interruption. Id.

that Plaintiff could occasionally lift between one and ten pounds, and could never lift 20, 25, or 50 pounds. Id. Dr. Ibrahim also reported that Plaintiff would likely be absent more than three times per month because of his disabilities. Id. In addition, Dr. Ibrahim found that Plaintiff could work only twenty hours per week "on a regular and consistent basis." Id. Asked to describe "any other limitations that would affect" Plaintiff's "ability to work at a regular job on a sustained basis," Ibrahim pointed to "chronic pain syndrome," and again referenced the FEC report. Id.

Physical Therapist James T. Copeland completed the FCE report on August 12, 2015. See R. at 857-72. That report finds Plaintiff capable of performing sedentary work. Id. at 857. Plaintiff could never work while standing, while elevated, kneeling, or in a reclining reach. Id. He could occasionally work sitting, while lowered either standing and sitting, and when squatting. Id. The report also concluded that Plaintiff could never crawl or climb ladders and could occasionally climb stairs, repetitively squat, and rotate his torso while standing or sitting. Id. He could frequently walk. Id. The report pointed to a number of "inconsistencies" in Plaintiff's performance. Id. at 858. He "improved" on at least one of the tests for endurance without any apparent reason. Id. When tested, Plaintiff had flexion/abduction in his right shoulder of less than thirty degrees, but he was later able to raise his arm and put his elbow on an elevated table top. Id. During another test, Plaintiff claimed that it hurt his knee to bend, but he sat with his knees bent throughout the testing. Id. There were also inconsistencies in his scoring, with Plaintiff showing more tolerance for some difficult tasks than for easier ones. Id. His reports of pain were not consistent with his performance on different tasks. Id. The report concluded that Plaintiff needed a sedentary work setting, and would have to "alternate between sitting and other tasks . . . to

12

tolerate the Sedentary level of work for the 8-hour day/40-hour week." Id. at 859. At the same time, Plaintiff's "self-limiting and inconsistent behavior" during the testing reduced the reliability of the testing. Id. As such, the report's assessment of Plaintiff's limits "indicates his minimal rather than his maximal ability." Id. The report indicated that Plaintiff self-limited on 81% of the tested tasks; less than 20% self-limiting was "[w]ithin normal limits." Id.

The ALJ's decision references Dr. Ibrahim only once by name. The ALJ stated that "In September 2015, the" Plaintiff's "primary care physician, Mohammed Ibrahim, M.D., confirmed that the" Plaintiff "had cervical disc disease, left medial meniscal tear, and reduced cervical range of motion." Id. at 17. Later, the ALJ appears to reference the FCE, noting that "although there were tolerance limitations to activities tested, the claimant's pain or pain behaviors were considered inconsistent with the observed deviations on tasks with regard to sitting, standing, overhead arm range of motion both standing and supine and walking." Id. at 22. The ALJ further noted that the "therapist" who performed the study found reason to doubt Plaintiff's effort. Id. at 22-23. The test may have done more to show "minimum" than "maximum" ability for the Plaintiff. Id. at 23. The ALJ mentioned these alleged inconsistencies in effort twice more in determining Plaintiff's capacity. Id. at 24, 25. The ALJ does not address Dr. Ibrahim's report by name in discussing the opinion evidence. Id. at 25.

The ALJ's decision names Dr. Ibrahim as Plaintiff's primary care physician but fails to address the opinion he offered as to Plaintiff's RFC directly. While the government offers argument as to why the ALJ could have rejected that opinion, focusing largely on the reports of inconsistent effort in the FEC report and the contradictions within Dr. Ibrahim's

13

findings, nothing in the ALJ's hearing opinion directly addresses the report itself. In failing

to do so, the ALJ has failed to explain the weight afforded that opinion and failed to provide

adequate reasons for whatever weight she gave the opinion. The government also

contests whether Ibrahim was even a treating physician. Since the ALJ considered Ibrahim

Plaintiff's "primary care physician," the ALJ at least saw some sort of treatment relationship

between Plaintiff and Ibrahim. The ALJ's failure to explore the nature of this relationship

undermines any explanation of the weight assigned–if any–to his opinion. In any case,

since the ALJ did not explain the weight she gave his opinion, the ALJ did not evaluate the

opinion evidence properly. An ALJ is required to provide an explanation for the weight

assigned to that evidence, and the Court finds that the case should be remanded to the

ALJ with instructions to explain how she considered Dr. Ibrahim's opinion in establishing

the RFC and what weight she gave to that opinion. See Snell, 177 F.3d at 133 ("Failure to

provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a

ground for remand.").

### B.      Consideration of Neck Pain and Chronic Headaches

The Plaintiff also argues that the ALJ's assessment of his RFC was "defective"

because she failed adequately to account for his neck pain and chronic headaches. The

Court declines to assess whether substantial evidence existed for the ALJ's conclusions in

this respect. The Court has determined that the ALJ failed to provide proper explanation

for her assessment of the expert evidence and will direct remand. Proper evaluation of the

expert evidence will require the ALJ to examine again the medical evidence and provide

explanation for whatever conclusion the ALJ reaches.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is

**GRANTED.**  The Commissioner's motion for judgment on the pleadings is **DENIED**. The

case is **REMANDED** for proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Dated:  January 6, 2020

Thomas J. McAvoy
Senior, U.S. District Judge